UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

ALEKSEY TOVARIAN,
     Plaintiff,

v.                          CASE NO. 2:24-cv-14037-AMC

RUBIC, LLC,
     Defendant.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO RUBIC, LLC MOTION TO DISMISS

     Plaintiff, ALEKSEY TOVARIAN, by and through his undersigned counsel, hereby files his Response In Opposition to RUBIC, LLC's Motion to Dismiss and states as follows:

## BACKGROUND

     1.     On March 11, 2024, Plaintiff filed his second amend complaint, asserting a single count of Defamation against Rubic, LLC pertaining to an article it published on the internet. Doc. 14.

     2.     As alleged in Plaintiff's complaint, he is an immigration attorney in San Francisco, California. Rubic is a Florida company which runs a website and blog which publishing information, specifically to Russian speakers, about life in the United States and immigration and related concerns to immigrants from Russian-speaking countries. Additionally, Rubic's website has a list of lawyers to which it refers and recommends to its readers. [1] On multiple occasions, Rubic invited Plaintiff to be part of their program but he declined and is not listed on their website. Thereafter, Rubic published an article falsely claiming that Teach BK controls Plaintiff and that he engages in unlawful kickbacks to TeachBK, Inc, a Florida Corporation, for referring clients to Plaintiff. [2] These alleged kickbacks are

---

[1] That page is located here: https://rubic.us/law/. Since filing his second amended complaint, where he identified another attorney listed in San Fransisco, Defendant appears to have removed the listing.

[2] Doc. 14, ¶26

1

unlawful in California and Florida. After the article was published, Plaintiff was told by an agent of Defendant that the article might be taken down if he agreed to associate with Rubic.

3.      The article claims that TeachBK associates with only **one** lawyer, Plaintiff, and claims that Plaintiff is paying illegal kickbacks to TeachBK for client referrals.

4.      Plaintiff alleges that false statements were made intentionally and with malice by Rubic to damage the Plaintiff. [3]

5.      Defendant filed a certified translation of the article on February 9, 2024. [4] The portions of the article at issue here provide:

> TeachBK offers immigration consultations, paid sponsors in the U.S., sells cars to asylum seekers in Mexico (*for crossing the U.S. border – relevant before the CBP One app*), visa assistance, and refers immigrants to ONE immigration attorney, receiving a commission.[5]
>
> …
>
> **"For each consultation, there's money involved. $200 for a consultation, $50 goes to us. Then a lawyer gets involved. We pass people through ourselves, so we control the lawyer. The lawyer 'spits out' some percentage to us for referring clients. And that's how the entire route is monetized. First – for consultations, then – for lawyers, and possibly, for adaptation consultations – we have those too. This way we create a service... a whole branch,"[6]**
>
> …
>
> Why do immigrants fall for TeachBK
>
> Alina Butman turned to this company because they collaborate with a U.S. citizen, a licensed attorney, Aleksey Tovaryan. She was confident that a lawyer would not risk his license or reputation. Another victim also said that after studying numerous TeachBK channels for over a month, it was the video consultations of the attorney that convinced him. In Telegram channels, Kiselev openly advertises lawyers' services for getting out of detention.
>
> *"We have Russian-speaking lawyers who work with people stuck in detention. They get them out – 100%. We've seen it with our own eyes. We've seen how people work. So, if anyone needs attorneys specializing in detention issues –private message us, message me personally – I'll connect you with these lawyers," - says Kiselev.*

---

[3] Doc. 14, ¶34.
[4] Doc. 4-1.
[5] Doc. 4-1, p.2
[6] Doc. 4-1 p. 8

The last name is not mentioned. But according to information available publicly, the Russian-speaking lawyer Aleksey Tovaryan has been collaborating with TeachBK for over 2 years. He records videos for their "Immigration US" channel on YouTube, participates in hours-long live streams, makes short video clips, gives consultations and recommendations, and gets people to trust the company.

6. There can be no doubt that the references in the article pertain to Plaintiff. They claim that TeachBK only refers to ONE immigration attorney, and expressly states that TeachBK has been associated with Plaintiff for over 2 years. Thus, the kickbacks referenced in the article would be those Defendant claims were paid by Plaintiff to TeachBK.

7. Rubic claims that this statement, which they publish as a direct quote, comes from a recorded statement from TeachBK's founder. Although outside the four-corners of the complaint, the translation of the recording does not support the published statement. Rather, the recording was a brainstorming as to what could be done to set up a similar platform as TeachBK in the United Kingdom. [7] The source "quote" reads as follows:

Accordingly, such a consultation may cost, say, 200 euros, for example. So, you can be the one conducting the consultation, or your people, whoever. On our platform, we are the ones doing it. On yours, TeachBK UK, you can be the one doing it, and so from each consultation, we receive money. For example, **if the consultation costs 200 EUR, we get 50 EUR.** And you can have 10 consultations a day—20, 30, depending on how actively we will be developing this whole thing—and provide useful content the way we're doing it for the United States. **Later, an attorney gets on board. Right? Because, either way, we filter the client through us, we are controlling him**. We understand that an agreement with an attorney is being signed. **An attorney spits a certain percentage to us for the referral;** a client that is already good and signed pays for that. Wonderful. You're getting money for that, and so are we. **And that way, the entire process is being monetized. Right? First with consultations, then by attorneys, then there could be some adaptation-related consultations; we provide those too**. **As such, we're creating a service** that responds to questions qualitatively. Questions like 'how, where, and what for' one could travel and how much it costs in the UK. Add to that, the service provides adequate lawyers; a pool of attorneys is being created. That's all. And the person ends up encircled in good service, totally happy, etc. Then, later, it's

---

[7] Doc. 5-1. p. 1, "So, with regard to the UK, Here's what can be done. We can create a TeachBK platform, TeachBK Great Britain, and say, You'll be our expert on the issues of political asylum in the UK. We will create a separate YouTube channel, TeachBK UK, so it is under the TeachBK brand, as it is known by all and trusted, and so we create a second branch; aside from the US, we do another UK branch."

possible to add money questions there, such as how to transfer money to the UK, and many other services could be included there. That's all. That way, **an entire branch is created.**[8]

8. Rubic misquotes the source material upon which they relied. In doing so, it changed the message. The source material was brainstorming how one might set up a TeachBK UK platform in the United Kingdom and provided examples of how that platform may work *in the UK.*[9] This was not a statement about how TeachBK operates in the US, but how an independent branch may operate in the UK and discusses licensing fees which would be paid from the UK to the US branch.

9. Rubic changed the currency involved, failed to explain that the €50 in the example was a kind of franchising fee that TeachBK UK would pay to the US company. The quote claims that TeachBK controls the lawyer, as opposed to the immigration client. It also fails to disclose that the referral fee from the attorney would be paid by a **<u>hypothetical</u>** UK barrister or solicitor, not Plaintiff or any other US based attorney.

## ARGUMENT

### I. Conflict of Law

Defendant argues that the Court should apply California law based on a conflict of law.[10] A federal court sitting in diversity applies the conflict of law rules of the forum state. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941). Before beginning a conflict of law analysis, a court should determine whether a conflict of laws truly exists. <u>Fioretti v. Mass. Gen. Life Ins. Co.</u>, 53 F.3d 1228, 1234-35 (11th Cir. 1995). No conflict of laws exists when the asserted conflict is a false conflict. <u>Tune v. Philip Morris, Inc.,</u> 766 So. 2d 350, 352 (Fla. Dist. Ct. App. 2000).  A false conflict arises when:

---

[8] Portions "quoted" in the article are highlighted in **Bold**

[9] Doc. 5, p. 2, ¶ 6, "I asked if Mr. Kiselev wanted me to send him my inquiries about immigration to the United States. He explained that he was not interested in that. I then asked whether he was interested in expanding TeachBK into the United Kingdom, and we began conversing about that concept."

[10] Doc. 17, p. 6

(1) the laws of the different sovereigns are the same, (2) the laws of the different sovereigns are different but produce the same outcome under the facts of the case, or (3) when the policies of one sovereign would be furthered by the application of its laws while the policy of the other sovereign would not be advanced by the application of its laws. *Id.*

Defendant provides no analysis as to what the "true conflict" between California and Florida law. Nonetheless, to the extent that Defendant attempts to apply California Law in order to utilize its anti-Slap statutes, Federal Court have declined to do so.

## II.      California Anti-SLAPP Does Not Apply.

Federal courts have declined to apply anti-SLAPP statutes like California's because they increase a plaintiff's burden to overcome pretrial dismissal, and thus conflict with Federal Rules 12 and 56. *See* Fed. R. Civ. P. 12, 56; Gov't Emples. Ins. Co. v. Glassco Inc., 2021 U.S. Dist. LEXIS 183510, *10 (M.D. Fla. Sept. 2021) (analyzing the differences between anti-SLAPP statutes and their conflicts with the Federal Rules); *see, e.g.*, La Liberte v. Reid, 966 F.3d 79, 83 (2d Cir. 2020) ("[W]e hold that California's anti-SLAPP statute is inapplicable in federal court because it increases a plaintiff's burden to overcome pretrial dismissal, and thus conflicts with Federal Rules of Civil Procedure 12 and 56."); *see also* Makaeff v. Trump Univ., *LLC*, 715 F.3d 254, 274-75 (9th Cir. 2013) (Kozinski, J., concurring) (discussing how California's anti-SLAPP statute conflicts with Federal Rules of Civil Procedure 11, 12, and 56, among others); Carbone v. Cable News Network, Inc., 910 F.3d 1345, 1349 (11th Cir. 2018) (holding that Georgia's anti-SLAPP statute's motion-to-strike provision, which contained a "likelihood of success" test, conflicts with Federal Rules of Civil Procedure 8, 12, and 56).

Because Federal courts have declined to apply California's anti-SLAPP laws, Defendant's argument is due to be rejected.

### III.      The Statement Is "Of and Concerning" Plaintiff

In Plaintiff's complaint, he explains that he is a California Attorney subject to California Rules of Professional Responsibility. Plaintiff explains that he is subject to Rule 8.4, which in part, explains that an attorney may not violated any of the rules of professional conduct, nor engage in "engage in conduct involving dishonesty, fraud, deceit, or reckless or intentional misrepresentation." Further, Rule. 5.4 provides, with exceptions not relevant here, California attorneys cannot "share legal fees directly or indirectly with a nonlawyer."[11]

#### *The statements imply Plaintiff is the "lawyer."*

As shown above, the article at issue expressly named Plaintiff as the **sole** attorney working with TeachBK over the course of more than 2 years and they include photos of Plaintiff. There can be no doubt that the references to an attorney in the article are imputed to Plaintiff.

#### *The Conduct Is Unlawful*

Here, Defendant published statements claiming that TeachBK "controls" Plaintiff. Specifically, Defendant misquoted a TeachBK representative, publishing the statement, "we control the lawyer".They also misquote the representative and claim that Plaintiff pays TeachBK a percentage for the referrals sent to him. i.e. pays a referral fee to a non-lawyer in violation of the rules of professional conduct. In truth and fact, the claimed source of this statement was a discussion of how

---

[11] Rules Prof. Conduct, rule 5.4(a); <u>Aerotek, Inc. v. Johnson Group Staffing Co., Inc</u>., 54 Cal. App. 5th 670, 680-681 (Ct. App. 2020).

to set up a business in the UK with UK barristers or solicitors; not TeachBK's US operations or any arrangement it may have with Plaintiff.

Ultimately, it is unlawful to have non-lawyers "controlling" Plaintiff in his representation of his clients, and for Plaintiff to pay a referral fee to a non-lawyer. Regardless of the law applied to the case, these are false statements of fact regarding Plaintiff and are actionable.

## IV.     Degree of Fault

Defendant argues that the complaint fails to show that Rubic acted with reckless disregard.[12] In fact, Plaintiff pleads that the statements were made intentionally and with malice.[13] Indeed, Plaintiff explains that Rubic has an attorney referral page on its website and requested that Plaintiff affiliate with Rubic but he declined to do so. [14] After he refused, the article was published. Thereafter, a representative of Rubic reached out to Plaintiff about affiliating with Rubic for a movie, and he was told that if he were to affiliate with Rubic the article would be removed.[15]

Moreover, although Defendant argues that they "relied on a source with public knowledge", the translated transcript of the source does not match the statements in the article. The article claims that the statement was an explanation of how TeachBK is structured[16]. In fact, the source recording was discussing a hypothetical, independent platform in the UK and how the hypothetical UK business could be structured and how it would compensate the US entity for the affiliation, as well as how the

---

[12] Doc. 17, p. 10.
[13] Id., p. 5. ¶34
[14] Id., p. 2, ¶ 9-11.
[15] Id. p. 3, ¶ 23.
[16] Doc. 4-1 p. 8

UK business may work with UK baristers or solicitors.[17] This mis-quote was then used to attack TeachBK and defame Plaintiff, presumably to put pressure on him to affiliate with Rubic. Regardless, Rubic cannot say it acted in good faith when it created a quote to fit its narrative. The publishing of the mis-quoted material was intentional and done with actual malice.[18]

## V.    Attorney's Fees

### *California Anti-SLAPP*

Plaintiff requests attorney fees pursuant to California anti-SLAPP laws. As argued above, Federal courts have declined to apply anti-SLAPP statutes like California's because they increase a plaintiff's burden to overcome pretrial dismissal, and thus conflict with Federal Rules 12 and 56. As such, Defendant's request for attorneys fees pursuant to California anti-SLAPP laws is due to be denied.

### *Florida Anti-SLAPP.*

Defendant asserts that it is entitled to its attorney fees because the case is without merit. As argued above, Rubic misquoted a source to change the meaning of their statement and by doing so, published statements indicating that Plaintiff pays non-lawyers, who Rubic claims control him, a referral fee in violation of the rules governing Plaintiff's practice of law. Defendants do not have a first amendment right to lie about the Plaintiff and impute unlawful conduct to him, especially if the

---

[17] According to the certified translation proffered by Defendant, the article even changed the currency from Euros to Dollars to impute the statement to the US operation, as opposed to the hypothetical European platform they were discussing.

[18] Defendant argues that Plaintiff admits that it is subject to the "actual malice" standard. Doc. 17, p. 13. Plaintiff does not make such an admission. Rather, the facts support the claim that the Defendant's conduct was intentional and done with malice, regardless of the standard applied in this matter.  to the extent that actual malice standard does apply, the fact underlying this action certainly meet this burden.

reason is to pressure Plaintiff into joining their platform. As such, the case is not "without merit" and Defendant's request for attorneys' fees is due to be denied.

## CONCLUSION

For those reasons argued above Plaintiff requests that Defendant's motion to dismiss and for attorney's fees be denied.

Dated this 12nd day of April 2024.

ARCADIER, BIGGIE & WOOD, PLLC

/s/ Maurice Arcadier, Esquire
Maurice Arcadier, Esquire

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the original of the foregoing was filed with the Clerk of Court by using the CM/ECF system, on this 12th day of April 2024. Counsel of Record for all parties will receive notice of the electronic filing.

ARCADIER, BIGGIE & WOOD, PLLC

/s/ Maurice Arcadier, Esquire
Maurice Arcadier, Esquire
Florida Bar No. 0131180
Attorney for Plaintiff
2815 W. New Haven, #304
Melbourne, Florida 32904
Phone: (321) 953-5998
Fax: (321) 953-6075
Email: Office@ABWlegal.com
Secondary: Arcadier@ABWlegal.com